IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| THERESA W. [1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:20-cv-241 |
| | ) | |
| KILOLO KIJAKAZI, [2] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Theresa W. ("Theresa") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for a period of disability and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Theresa alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the opinion of her treating physician; (2) determine her RFC using a function-by-function analysis; and, (3) assess her allegations regarding her symptoms. I conclude that the ALJ's decision is supported by substantial evidence. Accordingly, I **RECOMMEND DENYING** Theresa's Motion for Summary Judgment (Dkt. 15) and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 17).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Theresa failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). "The threshold for such evidentiary sufficiency is not high," Biestek, 139 S. Ct. at 1154, and the final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Theresa protectively filed for DIB in November 2016 claiming her disability began on March 1, 2016, due to arthritis, osteopenia, eczema, acid reflux, high blood pressure, depression, and anxiety. R. 235, 251. Theresa's date last insured ("DLI") was June 30, 2017; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive DIB. R. 73; Pl.'s Br. at 23, Dkt. 16; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Theresa's applications at the initial and reconsideration levels of administrative review. R. 128–138, 139–151. In November 2019,

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

ALJ Julianne Hostovich held a hearing to consider Theresa's claim for DIB. R. 89–127. Counsel represented Theresa at the hearing, which included testimony from vocational expert Lisa Goudy. On February 27, 2019, the ALJ entered her decision analyzing Theresa's claims under the familiar five-step process[4] and denying her claims for benefits. R. 71–82.

The ALJ found that Theresa was insured at the time of the alleged disability onset and that she suffered from the severe impairments of obesity, degenerative disc disease, osteopenia, bilateral patella femoral syndrome, mild compression fractures of the cervical and thoracic spine, kyphosis of the thoracic spine, chronic pain syndrome, and mild degenerative joint disease of the knees. R. 74. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 76–77. The ALJ specifically considered listing 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine). The ALJ also considered Social Security Ruling 02–1p. Soc. Sec. Ruling 02–1p Titles II & Xvi: Evaluation of Obesity,[5] SSR 02–1p, 2002 WL 34686281 (S.S.A. Sept. 12, 2002)[6]; id. The ALJ found that regarding her mental impairments, Theresa had no limitations in understanding, remembering,

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curium) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] In May 2019, the Social Security Administration rescinded and replaced SSR 02-1p with SSR 19-2p. Soc. Sec. Ruling 19-2 Titles II and Xvi: Evaluating Cases Involving Obesity, SSR 19-2p, 2019 WL 2374244 (S.S.A. May 20, 2019). The ALJ issued the decision in this case in February 2019, before the new rule. The old rules contained in SSR 02-1p therefore apply. See Williams v. Saul, No. 1:19-cv-983, 2020 WL 5802707, at *5 n.2 (E.D. Va. Sept. 29, 2020).

[6] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

and applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 76.

The ALJ concluded that Theresa retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 78. Specifically, Theresa can only occasionally climb, stoop, and crawl, but can frequently balance, kneel, and crouch. Id. The ALJ determined that Theresa could perform past relevant work as a pharmacy technician. R. 81. Thus, the ALJ determined that Theresa was not disabled. Id. Theresa appealed the ALJ's decision and the Appeals Council denied her request for review on March 13, 2020. R. 1–4.

## ANALYSIS

Theresa alleges that the ALJ failed to properly weigh the opinion of her treating physician, determine her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms.

### A. Medical History Overview

1. Medical Treatment

Theresa had a history of back pain, dermatitis, and degenerative disc disease, among other conditions, prior to her alleged onset date. See, e.g., R. 433, 462, 469, 513. Between March and July 2016, Theresa attended several appointments with her dermatologist, Chad Johnson, M.D. At each examination, Dr. Johnson reported coin-like patches on Theresa's hands and the soles of her feet. R. 517, 521, 525. He identified accompanying pustules on her hands and feet at her April 2016 appointment. R. 521. Throughout this period Dr. Johnson reported that Theresa's eczema was inadequately controlled, but he also found that she was in no acute distress. See id.

In August 2016, Theresa established care with Community Health Center of New River Valley and treated with Charles Smith, NP. R. 554. Mr. Smith performed a physical exam, noting no significant clinical findings, and he reported Theresa had a full range of motion in her

4

back and extremities. R. 555. Theresa followed-up with Mr. Smith in December 2016. R. 557. She reported being unable to afford dermatology care or medication, and Mr. Smith reported eczema on her hands and feet. R. 558. Mr. Smith performed a physical exam, reported no significant findings, and stated that Theresa had full range of motion in her extremities. R. 559.

Theresa followed-up with her primary care physician, Dr. Grube, in December 2016, noting that she sought disability for depression, back, and foot pain. R. 583. Dr. Grube diagnosed her with chronic midline low-back pain, psoriasis, and depression. R. 583–84. He modified her medication, encouraged healthy diet and exercise, and referred Theresa to an orthopedist for her disability claim. R. 584. Theresa attended an orthopedic referral for her back in December 2016. R. 575. She reported severe back and neck pain with associated radiation and tingling, and her MRI imagining showed degenerative changes and some mild compression fractures. R. 575–81. The referral physician performed a physical exam and found Theresa had a stable gate, was able to walk without an assistive device, had no tenderness, could bend her back, and had full (though painful) range of motion in her neck. Id. He also found that Theresa had normal reflexes and strength in her upper and lower extremities. Id. He ultimately concluded her examination results did not indicate eligibility for disability. Id. Theresa attended a second orthopedic referral for her knee in January 2017. R. 570. Her physical examination was negative though she had some quad weakness on her straight leg raise exam. R. 573. X-rays of Theresa's knees showed no fractures and appropriate alignment, however, there was mild degenerative change. R. 574. The referral physician recommended conservative management techniques, including physical therapy and medication. Id.

In February and April 2017, Theresa presented to Dr. Grube with complaints of right arm and shoulder pain, among other symptoms. R. 566, 703. Her physical examinations were generally normal, though her medication was modified at both appointments, and she was

diagnosed with chronic pain syndrome and depression at her April 2017 appointment. R. 566, 703–05.

Theresa followed-up with Dr. Johnson in March 2017. R. 781. Dr. Johnson reported coin-like patches on her hands, soles of her feet, and toes. Id. Theresa indicated that she discontinued some of her medication and Dr. Johnson provided her with sample medication. Id. She followed-up in April with an exacerbation of her symptoms, and Dr. Johnson reported coin-like patches on her hands and soles of her feet in addition to fissures on her toes. R. 776. At follow-up May and June appointments she had coin-like patches, but no fissures. R. 759, 765. She then received Dupixent injection training at a second June appointment. R. 759.

In May 2017, Theresa presented to Dr. Grube with complaints of tremors, noting she was having shaking spells, her legs gave out on her, and she was dropping things. R. 695. Dr. Grube noted she had no visible tremor or apparent neurological issue at the appointment, but referred her to neurologist Ahmet Burakgazi, M.D., for further evaluation. R. 696–97. Theresa attended a follow-up appointment with Dr. Grube in May 2017. R. 687. Dr. Grube reported no significant change in her symptoms, encouraged healthy diet and exercise, and advised her to follow-up with dermatology and rheumatology. R. 687–89.

After Theresa's date last insured she continued attending appointments with Dr. Grube and Dr. Johnson. See R. 660, 669, 678, 755. She also attended the neurological consult with Dr. Burakgazi in July 2017. R. 888. Theresa reported developing tremors in response to her fibromyalgia medication, and she noted these tremors subsided when she stopped using the medication. R. 889. She also reported trouble balancing and sensory neuropathy. Id. Her neurological exam revealed normal affect, attention, memory, and speech. R. 892. Dr. Burakgazi also reported Theresa had 5/5 strength in her upper and lower limbs, normal coordination, and

normal gait. R. 892–93. Dr. Burakgazi ultimately recommended referral to pain management,
beginning depression medication, and NCS/EMG testing in her upper limbs. R. 893.

Theresa presented at the emergency room in September 2017 for left arm and shoulder
pain. R. 942–46. A physical exam revealed tenderness and pain in her left shoulder and arm,
however, she exhibited normal range of motion and normal strength. R. 943. The emergency
room doctor diagnosed her with acute shoulder bursitis and chronic fibromyalgia pain and
recommended treatment with medication and a prescribed five-day outpatient course. R. 946. He
also recommended that Theresa wear her arm in a sling. Id.

2. Medical Opinions

State agency physician Gene Godwin, M.D., reviewed the record in December 2016 and
found Theresa capable of light work with certain exertional and postural limitations but no
manipulative or environmental limitations. R. 132–35. The ALJ gave Dr. Godwin's opinion great
weight. R. 80. State agency psychologist Nicole Sampson, Ph.D., also reviewed the record in
December 2016 and found Theresa had mild limitations in the ability to concentrate, persist, or
maintain pace and adapting and managing oneself. The ALJ gave Dr. Sampson's opinion some
weight. R. 75. State agency physician Jack Hutcheson, M.D., reviewed the record in May 2017
and similarly found Theresa capable of light work, finding the same exertional and postural
limitations. R. 146–50. The ALJ gave Dr. Hutcheson's opinion great weight. R. 80. State agency
psychologist Howard Leizer, Ph.D., reviewed the record in May 2017 and found Theresa had
mild limitations in understanding, remembering, or applying information, interacting with others,
concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 75. The
ALJ gave Dr. Leizer's opinion some weight.

Dr. Burakgazi wrote a medical source statement in October 2017. R. 898–900. He noted
it was "unclear, uncertain" when Theresa's described symptoms began. R. 900. Dr. Burakgazi

found that Theresa required an assistive walking device, could only sit, stand, and walk for up to two hours in an eight-hour workday, and required a position that allows her to shift positions at will. R. 898–99. He additionally found that Theresa could frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds, and she can rarely twist, stoop, crouch, and climb. R. 899. He found that Theresa would frequently experience pain or other symptoms severe enough to interfere with attention and concentration and that she is incapable of tolerating even "low stress" jobs. Id. Finally, he noted that Theresa is likely to be absent more than four days per month. The ALJ gave Dr. Burakgazi's opinion little weight. R. 80.

### B. Treating Physician's Opinion

Theresa argues that the ALJ failed to give proper weight to the medical opinion of her treating physician, Dr. Burakgazi. Theresa specifically contends that the ALJ "did not point to any other persuasive contradictory evidence [to] support[] [her] decision to give [Dr. Burakgazi's opinion] little weight" and that the ALJ failed to weigh his opinion as required in 20 C.F.R. § 416.927. Pl.'s Br. at 20–24, Dkt. 16. Theresa's argument amounts to a disagreement with the ALJ's findings and she essentially asks the court to reweigh the evidence.

Dr. Burakgazi authored one medical opinion in October 2017 after consulting with Theresa in July 2017. R. 885–96, 898–900. Dr. Burakgazi concluded that Theresa (1) required an assistive device for standing and walking, (2) could stand, walk, and sit between 0–2 hours a day, (3) required a job that allowed her to shift positions at will, (4) frequently experiences pain or other symptoms severe enough to interfere with attention and concentration, (5) is incapable of low stress jobs, and (6) would be absent over four days per month as a result of her impairments. R. 898–900.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if she finds the opinion "well-supported by medically acceptable clinical and

8

laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."13 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r, 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011).

Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)–(5), 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09–cv–622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG–17–1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

Here, the ALJ appropriately considered these factors and the record in determining that Dr. Burakgazi's opinion merited only little weight. The ALJ acknowledged Theresa's treatment

relationship with Dr. Burakgazi, noting that he performed a consultative neurological exam in July 2017, after the DLI. R. 80. The ALJ adequately supported her conclusion that Dr. Burakgazi's medical opinion was not consistent with his own July 2017 examination, noting that "[h]is exam showed decreased sensation in the hands and feet, normal cranial nerves, full strength in the upper and lower extremities, normal reflexes, normal coordination, and normal gait." R. 80. The ALJ suggested that these findings were generally normal and do not support the severe limitations described in his medical opinion, especially those describing Theresa's exertional limitations. Id.; see R. 892 (describing 5/5 strength in upper and lower limbs); R. 893 (describing normal coordination and gait).

Similarly, the ALJ supported her conclusion that Dr. Burakgazi's opinion is inconsistent with the medical evidence as a whole, comparing Dr. Burakgazi's opinion with the exams during the relevant period, which "showed painful range of motion in the neck, slightly decreased lumbar range of motion, decreased range of motion in the left knee, and bilateral quadriceps weakness, but were otherwise normal." R. 80; see also R. 575–81. She specifically noted, for instance, that contrary to Dr. Burakgazi's opinion, the pre-DLI record indicated that Theresa did not need an assistive device. R. 575–81. Finally, the ALJ's consideration of the consultative exam and medical opinion date was proper. [7]  See Brown v. Colvin, No. 6:15–cv–2539, 2016 WL 5539522, at *3 (D.S.C. Sept. 30, 2016).

[7] Theresa makes no direct argument that the ALJ failed to follow the requirements in Bird v. Comm'r but suggests that the proximity of Dr. Burakgazi's opinion to the DLI supports her claim. 699 F.3d 337, 340 (4th Cir. 2012). Here, the ALJ considered Dr. Burakgazi's opinion but noted that Theresa's consultative appointment occurred in July 2017 and Dr. Burakgazi authored his medical opinion in October 2017, both of which occurred after Theresa's June 2017 DLI. She also noted that Dr. Burakgazi did not back-date Theresa's limitations to her DLI date, but instead noted that he was "unclear, uncertain" when limitations at the level described began. R. 80, 900. While Bird requires an ALJ to consider post-DLI evidence in certain circumstances, there is no requirement that the evidence "be given any specific weight" or that the ALJ "completely ignore the fact that such evidence was submitted after the DLI." Brown v. Colvin, No. 6:15–cv–2539, 2016 WL 5539522, at *3 (D.S.C. Sept. 30, 2016). Here, the ALJ summarized post-DLI evidence, namely Dr. Burakgazi's neurological consultation records and his medical opinion. The ALJ then specifically considered this evidence in her analysis. See R. 80. In other words, the ALJ considered and analyzed the evidence as directed in Bird. 699 F.3d at 337, 340. The fact that the ALJ may have

10

The ALJ provided sufficient analysis of the factors in 20 C.F.R. § 416.927(c)(2). See

Hendrix v. Astrue, No. Civ. A 1:09-01283, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010)

("[A]n express discussion of each factor is not required so long as [the ALJ] applied the . . .

factors and provides good reasons for [her] decision."). The ALJ specifically considered

Theresa's treatment relationship with Dr. Burakgazi and his specialization. R. 80. She also

considered the entire medical record and Theresa's testimony—all of which sufficiently suggest

that Theresa did not suffer impairments to the degree described in Dr. Burakgazi's medical

opinion. See Waldo v. Saul, No. 9:18–1324, 2019 WL 5856434, at *11 (D.S.C. July 3, 2019)

(stating reviewing court should not undertake to reweigh conflicting evidence when ALJ

provides good reasons for the weight he assigned a treating physician's opinion). I conclude that

substantial evidence supports the ALJ's decision to give Dr. Burakgazi's opinion little weight.

### C.  Physical RFC and Function-by-Function Analysis

Theresa argues that the ALJ's physical RFC findings are not supported by substantial

evidence, specifically regarding her "limited ability to sit, stand or walk, [] her rate of

unacceptable absenteeism," and her ability to "sustain work activity." Pl.'s Br. at 24–25, Dkt. 16.

Theresa also argues that the ALJ ignored evidence contrary to her decision and erred in

concluding that she can walk without assistance. Pl.'s Br. at 20, 23, Dkt. 16. Theresa finally

asserts that the ALJ erred in finding her eczema non-severe at Step Two. Pl.'s Br. at 19, Dkt. 16.[8]

---

given it lesser weight is acceptable, especially when she supports her conclusions with evidence from the record pre-
DLI. See, e.g., Brown, 2016 WL 5539522, at *3 n.4.

    [8] Theresa also argues that the ALJ failed to present proper hypotheticals to the vocational expert. The ALJ
is not required to pose hypothetical questions to the vocational expert relating to impairments not supported by the
record. See Fisher v. Barnhart, 181 Fed. App'x 359, 364 (4th Cir. 2006) (citing Johnson v. Barnhart, 434 F.3d 650,
659 (4th Cir. 2005)) ("[A] hypothetical question is unimpeachable if it 'adequately reflect[s]' a residual functional
capacity for which the ALJ had sufficient evidence."); Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (stating
vocational expert's opinion must be in response to hypothetical questions that "fairly set out all of claimant's
impairments").

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

 In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

As a preliminary matter, the ALJ did not ignore evidence contrary to her decision. Theresa specifically argues that the ALJ ignored examination results from May to November

2015, which generally showed numbness in her lower extremities, degenerative changes in her

lumbar and thoracic spine, and some tenderness and reduced range of motion in her spine. Pl.'s

Br. at 23–24, Dkt. 16. Theresa correctly observes that the ALJ did not specifically describe each

of these records; nevertheless, the ALJ indicated at multiple points in her decision that Theresa

had degenerative changes in her back and associated range of motion issues. See R. 77

(describing April and November 2015 MRIs showing degenerative changes in Theresa's spine);

R. 77 ("The claimant's physical examinations showed painful range of motion in the neck [and]

slightly decreased lumbar range of motion."); R. 79 ("[Theresa] has a history of degenerative

disc disease that began prior to her alleged onset date."). Moreover, while the ALJ could have

provided a more detailed analysis of Theresa's medical records prior to her alleged onset date,

further analysis was not required. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir.

2014) (stating that there is "no rigid requirement that the ALJ specifically refer to every piece of

evidence in his decision"); Mellon v. Astrue, No. 4:08–2110–MBS, 2009 WL 2777653, at *13

(D.S.C. Aug. 31, 2019) ("[I]t is widely held that ALJs are not required to specifically discuss and

analyze every piece of evidence in the case in their narrative opinions so long as it is possible for

the reviewing court to realize that all relevant evidence was considered . . . in reaching the

ultimate decision") (collecting cases).

      Similarly, the ALJ adequately supported her conclusion regarding Theresa's ability to

walk without assistance. Theresa argues that she "testified that at times she must use a cane to

help her walk and Dr. Burakgazi [noted in his medical opinion] that she needs a cane or other

assistive devi[ce] while engaging in occasional standing/walking." Pl.'s Br. at 20, Dkt. 16. When

asked at the hearing whether she used an assistive device, Theresa testified that she "sometimes"

uses an assistive device "sometimes weekly, sometimes monthly." R. 108. The ALJ

acknowledged this testimony but noted that her review of the record showed "no mention of the

use of a cane during the relevant period." R. 79–80. The ALJ further cited to Theresa's

December 2016 orthopedic referral, where the referral physician noted that Theresa had a stable

gait and "[was] able to ambulate freely without use of an assistive device." R. 80, 580. The

ALJ's conclusion is further supported by Drs. Godwin and Hutcheson, who found that the record

showed no need for a cane. R. 134, 146.

Theresa also argues that the ALJ erred in finding her eczema non-severe. Pl.'s Br. at 19,

Dkt. 16. Specifically, she alleges that the medical record documents ongoing eczema breakouts

and continuous treatment. Id. She also argues that Drs. Godwin and Hutcheson identified that her

eczema was a severe impairment and that the ALJ "failed to explain why she did not adopt their

opinions." Id. There are regular references in the record to Theresa's eczema, namely Dr.

Johnson's treatment notes. See, e.g., R. 517, 521, 525. These records indicate that Theresa often

presented with coin-like patches on her hands and the soles of her feet and occasionally

complained of sore feet. See, e.g., R. 74, 517, 687. Dr. Johnson's reports consistently stated that

Theresa's eczema was "inadequately controlled" but found her in no acute distress.

The ALJ provided a thorough and detailed summary of these treatment records as part of

her Step Two analysis, describing nearly every dermatology visit Theresa had during the relevant

period as well as Theresa's occasional complaints to her primary care physician regarding her

sore feet. R. 74. The ALJ ultimately concluded, however, that Theresa's eczema was non-severe,

stating:

> While [Theresa] has had consistent treatment for her eczema with complaints of
> hand and foot soreness, the record does not support that her skin condition caused
> more than minimally vocationally relevant limitations. She maintained the ability
> to walk unassisted and use her hands without noted limitations.

Id.

14

Though the ALJ did not specifically reference Theresa's eczema in her Step Four analysis, she did continue to consider the resulting functional limitations associated throughout her opinion, specifically considering Theresa's ability to walk and her exams demonstrating "normal, stable gait without an assistive device." R. 80. The ALJ also considered Theresa's subjective allegations, namely her testimony regarding difficulty walking and using her hands. R. 78. See Kins v. Comm'r, No. 3:14–cv–86, 2015 WL 1246286, at *23–24 (N.D.W. Va. Mar. 17, 2015) (finding that the ALJ properly considered a non[-]severe impairment, despite not explicitly addressing it in the RFC section of the decision, where the ALJ elsewhere "made specific findings and provided an explanation for her conclusion that [the non-severe impairment] resulted in only minimal functional limitations"); see also Connie J. v. Comm'r, 4:18–cv–59, 2020 WL 2814181, at *9 (W.D. Va. May 14 2020) adopted by Connie J. v. Comm'r, No. 4:18–cv–59, 2020 WL 2812831 (W.D. Va. May 29, 2020) ("Because the ALJ cited relevant evidence and explained her step two assessment I find that substantial evidence supports [the ALJ's] determination that the non-severe impairment[] did not cause more than minimal limitations in [plaintiff's] ability to work.").

The ALJ's analysis is also supported by the opinions of the state agency doctors, whom she gave great weight. R. 134. The state agency doctors concluded that Theresa could operate hand or foot controls and could stand or walk approximately six hours a day. R. 134, 146. Moreover, regarding her eczema, they specifically noted that while "[r]ecords do show skin changes from eczema but [they] do not suggest this has caused severe mental or physical distress." Id.; see also R. 144 (noting that while dermatology records were not particularly detailed that there was no evidence of severe blistering or infection); R. 748, 751 (noting despite eczema flare-up, Theresa was in no acute distress). Theresa argues that the ALJ failed to adopt the state agency doctors' opinions, noting that these doctors identified her eczema as a severe

condition. Pl.'s Br. at 19, Dkt. 16. The ALJ's failure to adopt this portion of the state agency doctors' opinions is not error. The ALJ sufficiently explained why she concluded Theresa's eczema was a non-severe impairment, and her assessment is otherwise consistent with the state agency doctors' conclusion regarding the functional impact of Theresa's eczema. See Welch v. Saul, No. 1:19–cv–189, 2020 WL 4586882, at *8–9 (W.D.N.C. Aug. 10, 2020) (finding no error where ALJ gave great weight to state-agency doctors but did not adopt their assessments in full where ALJ's analysis was reasonable and supported by the record); Torres v. Saul, No. 2:19-cv-2000, 2020 WL 6264985, at *11 (D.S.C. July 22, 2020) (Even when an ALJ gives considerable weight to an opinion, she is not required to adopt an opinion wholesale).

Given the lack of objective medical evidence to indicate Theresa's eczema causes more than a minimal effect on her ability to work, I find no error in the ALJ's analysis as to this issue.

Theresa finally argues that the ALJ's physical RFC findings are not supported by substantial evidence, specifically noting that the ALJ failed to account for her limited ability to sit, stand, and walk, her need for breaks and absenteeism rate, and her ability to sustain work activity. Here, the ALJ's decision includes the narrative discussion required by SSR 96–8p and contains sufficient information to allow meaningful review.

Concerning Theresa's argument that the ALJ failed to account for her claimed potential need for additional breaks and absences and her inability to sustain work, the ALJ found that Theresa had no limitation in her ability to concentrate, persist, or maintain pace given that her mental status examinations generally showed no evidence of impairment. See R. 76, 351; see also R. 345, 357, 398 (normal mental status examinations). At her administrative hearing Theresa testified that she has constant pain, and in her initial functional report suggested that she takes breaks when performing her activities of daily living. R. 271. Notably, however, Theresa did not specifically testify that she would have difficulty sustaining work, or otherwise describe

16

specific difficulty regarding her ability to concentrate, persist, or maintain pace. See id. Nor does she cite to specific objective evidence in her brief supporting these impairments. See Pl.'s Br. at 19–26, Dkt. 16. The ALJ is not required to make specific findings related to each of Theresa's subjective assertions. See Shinaberry v. Saul, 952 F.3d 113 (4th Cir. 2020) (ALJ did not err in refusing to fully credit claimant's subjective statements regarding her physical limitations where claimant pointed to no medical evidence in support of a limitation); see also Sellers v. Saul, No. 1:19–cv–272, 2021 WL 1166758, at *4–5 (W.D.N.C. Mar. 26, 2021) (finding no error where "ALJ d[id] not specifically explain how his finding that the Plaintiff had a 'mild limitation' in 'concentrating, persisting, or maintaining pace' comported with [his] later RFC assessment."). The ALJ also considered Theresa's physical condition, finding that while Theresa had some weakness and range of motion issues, her physical examination results throughout the relevant period were generally normal. See R. 77, 79 (describing Theresa's physical examinations and noting that her "physical examinations showed painful range of motion in the neck, slightly decreased lumbar range of motion, decreased range of motion in the left knee, and bilateral quadriceps weakness, but were otherwise normal"). The ALJ gave the state agency physician opinions great weight, concluding that together with the other evidence in the record, Theresa could complete a normal workday. R. 79–80. Theresa does not point to any evidence in the record that specifically contradicts these findings, nor does she assert that the ALJ failed to consider any treatment records, medical evidence, or subjective complaints establishing that she could not sustain work or would otherwise require additional breaks or absences.

Similarly, regarding Theresa's claim that the ALJ failed to account for her limited ability to sit, stand, and walk, the ALJ specifically acknowledged Theresa's hearing testimony, but found that despite her physical impairments, she had generally normal physical exams. See R. 79–80 (describing physical examinations between August 2016 and May 2017). The ALJ also

considered that Theresa's orthopedic referral revealed "normal, stable gait without an assistive device" and that Theresa's appointment with Dr. Burakgazi in July 2017, though revealing some decreased sensation in her hands and feet, similarly revealed "full strength in the upper and lower extremities, normal reflexes, normal coordination, and normal gait." R. 80. Finally, the ALJ gave great weight to the state agency physicians' who ultimately concluded that Theresa could operate hand or foot controls and could stand or walk approximately six hours a day. R. 134, 146.

The ALJ was only required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to [her] conclusion," which the ALJ did in her discussion of the medical and non-medical evidence, Theresa's alleged symptoms, and the medical opinions of record. The ALJ considered Theresa's complaints and explained why the evidence did not support greater RFC restrictions. This narrative discussion allows this court to see how the evidence in the record supports the ALJ's RFC determination. Because I was not "left to guess" at how the ALJ reached her RFC determination, I find that the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### D. Subjective Allegations

Theresa asserts that the ALJ's assessment of her allegations is not supported by substantial evidence. Specifically Theresa complains that the ALJ "does not provide an explanation as to how the evidence she cited actually supports her [RFC determination]" and that she "fails to explain how the evidence she cited actually establishes [Theresa's] allegations are not fully supported."[9] Pl.'s Br. at 26–27, Dkt. 16.

---

[9] Theresa also argues that the ALJ improperly weighed Dr. Burakgazi's opinion and "ignored significant evidence of record confirming the severity of [her] impairments." Pl.'s Br. at 26, Dkt. 16. As these arguments are addressed in Parts B and C, I do not repeat them here.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4.  "At this step, objective evidence is *not* required to find the claimant disabled." Arakas v. Comm'r, 893 F.3d 83, 95 (emphasis in the original) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id.

The ALJ's opinion includes a discussion of Theresa's medical history, along with her own allegations, and the ALJ adequately supported her finding that Theresa's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ found that Theresa's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 78–79. Specifically, the ALJ noted several physical examinations between August 2016 and May 2017 where Theresa had generally normal physical examinations that, while revealing some pain and tenderness, showed generally full range of

19

motion in her back and neck and ability to walk without an assistive device. R. 78–79. The ALJ highlighted Theresa's December 2016 and January 2017 orthopedic referrals, where the referral physicians noted relatively normal review of symptoms and recommended conservative management techniques including physical therapy exercises and medication. R. 572–73 (showing some knee pain, quad weakness, and atrophy on the straight leg raise, but otherwise noting no fractures, appropriate alignment, and only mild degenerative change), 579–81 (showing stable gait, ability to walk without assistive device, no spine tenderness, full range of motion in back and neck (though painful), and normal strength and reflexes in Theresa's upper and lower extremities). The ALJ also considered Theresa's testimony that she "sometimes" required a cane to walk, but ultimately found that medical records prior to her date last insured did not support her testimony. R. 79. The ALJ next considered her post-DLI neurology consultation with Dr. Burakgazi in July 2017, which, again, revealed a relatively normal physical state. See R. 892–93 (noting Theresa had 5/5 strength in her upper and lower limbs, normal coordination, and normal gait).

The ALJ also relied on the state agency doctors, whom she gave great weight. R. 134. The state agency doctors found that Theresa's subjective allegations were only partially consistent with the medical and nonmedical evidence, and they concluded that Theresa could operate hand or foot controls and could stand or walk approximately six hours a day. R. 134, 146–48 (noting that Theresa's "current exams are largely normal and do not show need for a cane"). The state agency doctors also noted that she had no significant impairment in functioning, noting that "she handles personal care, drives, goes shopping, and talks with

others."[10] R. 133. The ALJ found this assessment consistent with Theresa's generally normal physical exams throughout the relevant period. R. 79.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Theresa does not identify any subjective complaints that the ALJ failed to consider. Nor does she identify specific instances in this case where the ALJ improperly applied the legal standards. Rather, Theresa asks this court to re-evaluate her subjective allegations and come to a different conclusion from that of the ALJ. That is not the standard of a social security appeal. Accordingly, I conclude that the ALJ supported his analysis of Theresa's subjective complaints with substantial evidence and that Theresa is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment and **DENYING** Theresa's Motion for Summary Judgment.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note

---

[10] The ALJ considered Theresa's testimony that she watches television, reads, and visits with her neighbors, albeit with breaks, due to pain. R. 78. The ALJ noted that her physicians advised her to increase her activity. R. 79; see also R. 558, 574, 581, 608 (treatment notes recommending increasing physical activity). Though Theresa noted that she required breaks in her individual function report, see R. 271, she did not specifically testify needing breaks when describing her activities of daily living at her hearing, see R. 118–19 (noting that she visits her cousin, watches television, cleans by doing what "[she] can do," goes grocery shopping with her husband, drives, and pays bills).

Pageid#: 1074

any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered:  July 29, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge